UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kelly Neumann,

Civ. File No. 01-2339 (PAM/RLE)

Plaintiff,

v.

AT&T Communications, Inc., a Delaware Corporation and Gates McDonald Co., an Ohio Corporation,

Defendants,

**MEMORANDUM AND ORDER**

Kelly Neumann,

Civ. File No. 01-1551 (PAM/RLE)

Plaintiff,

v.

AT&T Communications, Inc.,

Defendant.

This matter is before the Court on Defendants' Motions for Summary Judgment on Plaintiff's state and federal claims. For the following reasons, the Court grants the Motions with respect to the federal claims and remands the remaining state-law claims to state court for adjudication.

**BACKGROUND**

Plaintiff Kelly Renee Neumann worked for Defendant AT&T Communications, Inc. ("AT&T") as a Credit Representative and a Customer Sales and Service Specialist for 11 years before her employment was terminated on September 30, 1999. The present case arises

FILED MAY 0 8 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAY 0 8 2003
DEPUTY CLERK

from a workplace accident that occurred on October 6, 1998.

The parties do not dispute the fact that Neumann suffered extensive back injuries before the accident on October 6, 1998. In her brief, Neumann observes that "[p]rior to the October 6, 1998, injury, Neumann had been diagnosed with degenerative disc disease from L3 to S1." (Neumann Opp'n Mem. to AT&T Mot. at 2-3.) Dr. Glenn Buttermann initially treated Neumann on March 3, 1997, for back pain relating to injuries suffered from two car accidents, one on May 12, 1992, and another on September 7, 1994. (Bader Aff. Ex. B. at 1-3.) In addition, Neumann discussed subsequent incidents of severe back pain. (Id.) Dr. Buttermann referred to an MRI performed on September 16, 1996, and concluded that the MRI "showed a L4-5 diffuse bulging disc, with an annular degeneration change noted." (Id.) Further, Dr. Buttermann observed that "[t]here was L5-S1 disc degeneration changes as well." On February 16, 1998, Dr. Buttermann diagnosed Neumann as having degenerative disc disease at L4-S1. (Id.) Neumann underwent a series of epidural injections as part of the treatment, each of which left her unable to work for days at a time. Dr. Buttermann examined Neumann on September 14, 1998, and contemplated surgery as an option for the degeneration at L4 and L5:

> Patient has advanced degenerative disc disease L4 to S1 with HIZ's [herniations of intervetebral discs] at both levels. . . . She actually got a little bit better after her epidural steroid injections. . . . However, now her pain is getting worse. She's had to take days off work because of the increased pain. She's also restricted her recreation activities severely and does not even do simple things anymore. She did get a second opinion from a neurosurgeon recently in June or July, I believe, who agreed with a fusion as a treatment option for her. We also got an updated MRI scan from April 1998; there were

> essentially no major changes. She has advanced degeneration at L4-5 and L5-S1 with HIZ's at both levels.

(Hedican Aff. Vol. II, Ex. B at 150.)

Neumann's brief explains that her final injection occurred on October 1, 1998. (Neumann Opp'n Mem. to AT&T Mot. at 3.) Neumann had taken several days off due to the injection and October 6, 1998, was her first day back at work. (Hedican Aff. Vol. II, Ex. B at 324 ("Pre-existing back condition, had returned to work on 10/6/98 after being out 4 or 5 days for her back.").) On October 6, 1998, Neumann fell and injured her back while reaching for some books at work. One of the main issues in this case is whether, as a result of the injury suffered on October 6, 1998, Neumann qualified for workplace accident benefits or whether she is eligible for benefits given for injuries that occur outside of work.

The doctors who subsequently examined Neumann have reached slightly different conclusions, but two of the three agree that the October 6, 1998, injury contributed to Neumann's inability to work. On October 7, 1998, Neumann visited Dr. Buttermann, who observed that Neumann complained of pain that was different than before. (Bader Aff. Ex. 10 ("Previously her back pain would radiate to the thigh in a referred fashion, but now she actually has pain radiating all the way down the right leg to the foot.").) However, at that time, Dr. Buttermann concluded that "[t]here is no change from her prior MRI scan." (Id.) On October 9, 1998, a new MRI was performed, showing, in Dr. Buttermann's words, "degeneration and a mild broad based bulging disc, which was somewhat worse on the right and into the foramen than on the previous MRI scan at L5-S1." (Bader Aff. Ex. B at 4.) On

February 7, 2000, Dr. Barnett examined Neumann, concluding that the degenerative disc disease at L4 and L5 predated her October 1998 work injury and that she did not sustain a permanent injury. (Id. at 5.) One month later, on March 17, 2000, Dr. Paul Biewen summarized his treatment of and recommendations for Neumann. (See Bader Aff. Ex. II.) He provided a 10% permanent partial disability rating for Neumann. (Id. at 3.) On March 29, 2000, Dr. Buttermann agreed with Dr. Biewen's conclusion concerning the causes of the 10% disability rating. (Bader Aff. Ex. B. at 6.) Both Dr. Buttermann and Dr. Biewen concluded that the 10% disability rating was due in large part to Neumann's pre-existing condition (75%) and in smaller part to the October 1998 workplace injury (25%). (Bader Aff. Ex. B at 6, Ex. II at 3.)

Shortly after her accident, Neumann filed a claim under Minnesota's workers' compensation laws which was accepted by AT&T. In addition to worker's compensation benefits, Neumann was a participant in the AT&T Sickness and Accident Disability Benefits Plan ("SADBP"). Her absence from work indisputably qualified her for benefits under the applicable provisions of the SADBP. The SADBP, governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, contemplates two mutually exclusive categories of benefits: "sickness" benefits and "accident" benefits.

Sickness benefits provide the recipient with 13 weeks of pay at full salary, but only ½ salary for the following 39 weeks. (Hedican Aff. Vol. 1, Ex. 1 at § 3.2(a).) After the total 52 weeks, the recipient must either return to work or face termination of benefits and

employment. Accident benefits resemble sickness benefits in some respects, such as the full salary for the first 13 weeks. However, after the 13th week, when covered by accident benefits, the recipient collects ½ salary "for as long as Employee remains disabled." (Id. at § 4.2(a).) Worker's compensation benefits are also disbursed until the point of maximum medical improvement. Recipients of worker's compensation benefits receive ⅔ salary from the time of injury until they reach maximum medical improvement. The dispute centers on Defendants' decision to classify Neumann's injury and interpret the SADBP provisions so that Neumann was eligible for sickness benefits, but not accident benefits.

An employee qualifies for accident benefits when he or she cannot work because of an injury suffered solely in the course of his or her employment. In contrast, an employee is eligible for sickness benefits when he or she cannot work because of sickness or any disability not arising from an injury suffered solely in performance of that employee's job duties. Defendants based their decision on Neumann's medical records, which indicated that she had a pre-existing back injury. Because the pre-existing injury did not result from anything related to her job, Defendants determined that she could not collect accident benefits. Instead, they approved her for sickness benefits.

In addition to these benefits, Neumann was approved for workers' compensation benefits. The workers' compensation benefits and the SADBP benefits are not aggregated. Rather, the beneficiary receives whichever is higher. In this case, for the first 13 weeks, Neumann was paid under the sickness benefits plan because the full salary to which she was

entitled under the sickness benefits plan exceeded the ⅔ salary to which she was entitled under workers' compensation. Thereafter, she was paid at ⅔ of her salary under workers' compensation because the workers' compensation benefits were higher than the sickness benefits. Neumann received workers' compensation benefits through May 2000, ninety days after she was deemed to have reached maximum medical improvement.

Neumann was continually advised by letters that her fifty-two weeks of coverage would expire on October 12, 1999, and that both her employment and sickness benefits would be terminated at that point. Neumann contends that she did not receive notice that Defendants' payments to her were made pursuant to the sickness benefits plan. Instead she thought that the notices did not apply to her, because she was receiving workers' compensation benefits.

At the expiration of the sickness benefits period, Neumann could not return to work, even on a part-time basis. In Neumann's department at AT&T, employees are subject to a strict return-to-work policy. Pursuant to the policy, employees may work part-time when limited by a disability, but only for a maximum of 30 days. After 30 days, the employee must be capable of working full-time. If an employee's injury or disability prevents him or her for working part-time, or if after thirty days, the injury restricts the employee from working full-time, AT&T will discharge that employee. In this case, Neumann attempted to return to work at the close of the 52-week benefits period. Neumann claims that Defendants first approved a flexible schedule, allowing a gradual return to work and eventually requiring

Neumann to work full-time after 60 days. However, AT&T disputes this claim and argues that instead, it informed Neumann that it could not modify the return-to-work policy. Neumann also contends that this policy is not written, but is at best only informal. AT&T terminated Neumann's employment at the end of the 52-week sickness benefits period because Neumann could not work for the minimum hours required under the return-to-work policy. Neumann challenges this policy, arguing that it constitutes disability discrimination.

On December 12, 1999, Neumann brought suit against AT&T for violations of the Workers' Compensation Act ("WCA"), Minn. Stat. § 176.82 (Case No. 01-1551). The case was removed to this Court and the Court denied Neumann's motion for remand, noting that ERISA preempted the section 176.82 claims. Neumann v. AT&T Communications, Inc., No. 01-1551, 2001 WL 1640066, *2-3 (D. Minn. Nov. 8, 2001) [hereinafter Neumann I]. The Court later construed Neumann's Complaint as raising two separate claims under subdivisions one and two of section 176.82. Neumann v. AT&T Communications, Inc., Nos. 01-1551 and 01-2339, 2001 WL 1949747, *2 (D. Minn. Aug. 12, 2002) [hereinafter Neumann II]. Subdivision one prohibits any person from discharging or threatening to discharge an employee for seeking workers' compensation or in any manner intentionally obstructing an employee from seeking workers' compensation. Subdivision two prohibits an employer from refusing to offer continued employment when employment is available within the employee's physical limitations. On February 28, 2002, Neumann brought a second law suit (Case No. 01-2339) against both AT&T and Defendant Gates McDonald

Company ("Gates McDonald"), the administrator for insurance and workers' compensation benefits for AT&T. The Complaint raises four claims: a federal, common-law estoppel claim against both Defendants; ERISA violations against both Defendants based on the alleged misclassification of Neumann's injury; a Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363.01, et seq., claim against AT&T for disability discrimination in the form of failure to make reasonable accommodations for Neumann's disability; and a violation of Minnesota Statutes section 176.82, subdivision 1, against Gates McDonald only. The two cases were consolidated shortly after Neumann filed the second case.

In response to Defendants' motion to dismiss last August, the Court ruled that the exclusive remedy provisions of the WCA, Minn. Stat. § 176.031, precluded Neumann from bringing an MHRA claim for discrimination, and the MHRA claim was dismissed. Neumann II, at *3. In addition, the Court reconsidered its earlier decision in Neumann I and held that ERISA did not preempt the WCA § 176.82 subdivision 2 claim for discrimination. The Court exercised pendent jurisdiction over that claim pursuant to 28 U.S.C. § 1441(c). Id. Therefore, four claims remain before the Court on Defendants' Motions for Summary Judgment: (1) an ERISA violation based on the alleged misclassification; (2) an estoppel claims against both Defendants; (3) a WCA § 176.82, subdivision 1, retaliation and interference claim against Gates McDonald; and (4) a WCA § 176.82, subdivision 2, disability discrimination claim.

## DISCUSSION

### A. Standard of Review

Defendants move for summary judgment pursuant to Rule 56(c), which provides that such motions shall be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. Enter. Bank v. Magna Bank, 92 F.3d 740, 747 (8th Cir. 1996).

The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B. ERISA Violation

The heart of the lawsuit is Neumann's claim that Defendants misclassified her injury, giving her sickness benefits instead of accident benefits. The two types of benefits differ in primarily one respect: sickness benefits cease after 52 weeks, while accident benefits continue for as long as the employee remains disabled. In bringing an ERISA claim, Neumann asks the Court to review that classification by the AT&T Benefit Claim and Appeal Committee (the "BCAC").

1. Plan Administrator's Decision

Before reviewing the BCAC's decision, the Court must determine the appropriate standard of review, which the parties dispute. Where an ERISA benefit plan grants discretionary authority to a plan administrator, the decision of the administrator is reviewed for an abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). However, Neumann urges the court to apply a lower standard pursuant to Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir.1998). To receive the benefit of the less-deferential standard, Neumann "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." Id. According to Neumann, Defendants' failure to consult a medical specialist and other procedural irregularities require the application of the lower standard. In addition, because the SADBP is funded by the general operations funds, AT&T has a financial interest in denying benefits and thus has a conflict of interest that mandates less-deferential review. See id. at 1161 (finding a conflict of interest where, inter alia, plan administrator received direct financial benefit from denying benefits).

When a conflict is found, the Court should apply a "sliding scale" approach where "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." Id. at 11. In this case, however, the Court need not locate the exact point on the sliding scale because even under a de novo

review, the undisputed evidence establishes that Neumann was eligible for sickness benefits only, not accident benefits.

2. The Alleged Misclassification

Initially, the Court observes that its review of the BCAC's alleged misclassification is limited to the evidence that was before the BCAC at the time it made the decision to classify Neumann as eligible for sickness benefits. See Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997). Accordingly it will not take into consideration other evidence, such as the evidence before the Workers' Compensation Judge, unless that evidence was also before the BCAC at the time of its decision.

Neumann argues that the SADBP is ambiguous because the definition "sickness" is susceptible to two different reasonable interpretations, due to a dangling modifier attached to the end of the definition. However, looking at the SADBP as a whole, the Court finds that the SADBP is not ambiguous. The SADBP provides that "sickness shall include injury other than accidental injury arising out of and in the course of employment." (Hedican Aff., Vol. I, Ex. 1, § 3.1 at 10.) Neumann argues that the clause "arising out of and in the course of employment" could modify the term "accidental injury." Neumann notes that this term could also refer back to the first mention of "injury." However, the definition of "accident" and other plan language in the SADBP confirm that only the first interpretation is reasonable.

Under the SADBP, a recipient is entitled to accident benefits when disabled as a result of "accidental injury (not including the accidental injuries specified in Section 5.12 (Special

Classification)) arising out of and in the course of employment." (Id. Ex. 1, § 4.1 at 13.) Section 4.6 of the SADBP further defines "arising out of and in the course of employment." It reads: "[a]ccidental injuries shall be considered as arising out of and in the course of employment only where the injury has resulted solely from accident during and in direct connection with the performance of duties to which the Employee is assigned." (Id. Ex. 1, § 4.6 at 15.) This section also provides that "there must be a clear and well-established history of the cause and circumstances of injury accidentally inflicted," and the cause and circumstances "must be sufficient to produce the alleged injury." (Id.) This language makes clear that the ambiguous phrase describing sickness benefits modifies the term "accidental injury," and not the first mention of "injury." Therefore, the SADBP does not contain any ambiguities, and is subject to only one reasonable interpretation.

Defendants are entitled to summary judgment on this claim because, even under a less-deferential standard of review, the BCAC correctly classified Neumann's injuries. In this case, Neumann suffered from a lengthy history of back problems. Neither party disputes that at the injury at work on October 6, 1998, re-injured her back. Neumann's claim hinges on her belief that she also suffered a new injury on that day. However, the SADBP does not provide any special provisions for an employee who both re-injures a pre-existing injury and suffers a new injury. Under the plain language of the SADBP, an employee qualifies for accident benefits "only where the injury has resulted solely from accident." (Id.) Both Dr. Biewen and Dr. Buttermann attributed only 25% of Neumann's permanent partial disability

to the injury on October 6, 1998, and opined that 75% of her disability is a result of her prior injuries. Based on the plain language of the SADBP Neumann does not qualify for accident benefits, which are only available to employees who suffer a completely new injury at work. While the Court sympathizes with Neumann, she was not without any benefits. Neumann was eligible for and received sickness benefits. The only reasonable interpretation of the SADBP is the one made by this Court and the BCAC. Therefore, Defendants are entitled to summary judgement on Neumann's ERISA claims.

**C. Estoppel Claims**

Neumann's Complaint in case No. 01-2339 raises a claim of "Estoppel and Ratification" against both Gates McDonald and AT&T. While the Complaint is not a model of clarity, the Court distills two possible estoppel arguments. First, Neumann apparently invokes the doctrine of estoppel to argue that Defendants misinterpreted or misapplied an ERISA plan. Second, Neumann also alleges that Defendants stated that she could disregard the notices informing her that her employment and ERISA plan benefits would be terminated at the end of the 52-week period. Neumann apparently argues that these statements estopped Defendants from terminating her employment and SADBP benefits after 52 weeks. Neither claim survives summary judgement.

Before deciding whether equitable estoppel will give rise to an ERISA claim, a court must first find that the plan in question contains ambiguities. Wylie v. MacMillan Bloedel Packaging, Inc., No. 99-3052 WA, 230 F.3d 1365, 2000 WL 1051987, * 2 (8th Cir. Aug. 1,

2000) (unpublished opinion) ("Equitable estoppel will not lie unless the relevant plan provisions are ambiguous.") (citing Slice v. Sons of Norway, 34 F.3d 630, 633-34 (8th Cir. 1994) and Jenson v. Sipco, 38 F.3d 945, 953 (8th Cir. 1994)); Fink v. Union Cent. Life Ins. Co., 94 F.3d 489, 492 (8th Cir. 1996). In this case, as discussed above, the terms of the SADBP are not ambiguous, and Neumann's first estoppel claim fails.

In addition, Neumann's first estoppel claim does not allege that Defendants made any statements purporting to give the allegedly ambiguous language in the SADBP any meaning other than the one ultimately used to justify denying Neumann's claim for accident benefits. Consequently, Neumann also fails to establish that she relied on any statements by Defendants interpreting these provisions. The only statements Neumann attributes to Defendants pertain to her second estoppel claim, not her first. Therefore, the record does not create a question of fact on whether Defendants are estopped from interpreting and applying the SADBP's provisions to classify Neumann's injury as covered by sickness benefits instead of accident benefits.

Neumann's second estoppel claim is that because Defendants allegedly told her that she could disregard the termination notices she received, Defendants were estopped from actually terminating her benefits and employment. Defendants are entitled to summary judgment on this claim as well. Parties may not use an estoppel theory to modify the unambiguous terms of an ERISA plan. Fink, 94 F.3d at 492 (holding that common-law estoppel principles cannot be used to obtain ERISA benefits that are not payable under terms

of ERISA plan and that courts may apply estoppel doctrine in ERISA case only to interpret ambiguous plan terms).

In this case, Neumann alleges that AT&T manager Mark Peterson and an unnamed representative of CIGNA, AT&T's insurance carrier, informed her that she could disregard the termination notices because she was receiving worker's compensation benefits, not sickness benefits. However, under the unambiguous terms of the SADBP, sickness benefits cease after 52 weeks. Neumann seeks to render this provision meaningless based on Defendants' alleged statements. Fink prohibits this very action. Therefore, Defendants are entitled to summary judgment on Neumann's second estoppel claim as well.

**D. Subdivision 1 Claim**

Neumann's Complaint (Case No. 01-2339) raised a claim under subdivision 1 of section 176.82 of the WCA against Gates McDonald. The Court has already ruled on two separate occasions that ERISA preempts Neumann's subdivision 1 claim against AT&T. Neumann II, at *3 n.3; Neumann I, at *2-3. Therefore, the law of the case establishes that ERISA also preempts Neumann's subdivision 1 claim against Gates McDonald.

**E. Disability Discrimination Claim**

In Neumann II, the Court ruled that Neumann's MHRA claim was precluded by Minnesota Statutes § 176.82, subdivision 2, the provision of the WCA that prohibits disability discrimination. Neumann brings her MHRA claim against AT&T only, challenging its return-to-work policy. Under that policy, when an employee in Neumann's

department at AT&T is disabled, AT&T allows him or her to work part-time for 30 days. After those 30 days, however, if the employee cannot return to full-time work, AT&T discharges that employee. Neumann's claim contends that AT&T, by following its return-to-work policy, effectively "refuse[d] to offer continued employment" to Neumann, even though "employment [was] available within [Neumann's] physical limitations."

The Court previously exercised pendent jurisdiction over this claim pursuant to 28 U.S.C. § 1441(c), which provides that a district court may consider non-removable claims when they are joined with removable claims. Neumann II, at *3 n.3. In this case, the WCA claims are non-removable. See 28 U.S.C. § 1445(c) ("A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States."). Because the Court had joined those claims to the removable ERISA and estoppel claims, jurisdiction was proper under the § 1441 exception to § 1445. However, given the Court's resolution of Neuamnn's ERISA claim, no non-removable claims are pending before the Court. Therefore, the Court remands Neumann's subdivision 2 claim against AT&T for disability discrimination.

**CONCLUSION**

For the foregoing reasons and based on all the files, records, and proceedings herein, the Court finds that the BCAC correctly classified Neumann's injury and that the BCAC gave the disputed provisions of the SADBP their only reasonable meaning. In addition, the Court finds that the terms of SADBP are not ambiguous and that Neumann has not established the

elements for any estoppel claim. The Court dismisses Neumann's WCA claim against Gates McDonald pursuant to the law of the case. Finally, the Court no longer has jurisdiction to adjudicate Neumann's WCA claim for disability discrimination against AT&T.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendant AT&T's Motion for Summary Judgment on Nuemann's federal claims (Clerk Doc. No. 39, Case No. 01-1339) is **GRANTED**;
2. Defendant Gates McDonald's Motion for Summary Judgment on Neumann's federal claims (Clerk Doc. No. 34, Case No. 01-2339) is **GRANTED**;
3. Neumann's claim against Gates McDonald for violations of Minnesota Statutes § 176.82, subdivision 1 (Case No. 01-2339) is **DISMISSED**; and
4. Neumann's claim against AT&T for violations of Minnesota Statutes § 176.82, subdivision 2 (Case No. 01-1551) is **REMANDED** to state court.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 8, 2003

Paul A. Magnuson
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*